UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 FEB 12  PM 3: 03

CLERK

BY _____
DEPUTY CLERK

JAY R. MCLAUGHLIN,                )
                                 )
          Plaintiff,             )
                                 )
     v.                          )        Case No. 2:19-cv-00112
                                 )
LANGROCK SPERRY & WOOL, LLP,     )
                                 )
          Defendant.             )

**OPINION AND ORDER**
**GRANTING IN PART, DENYING IN PART, AND DEFERRING RULING IN
PART ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 83)

Plaintiff Jay R. McLaughlin ("Plaintiff") brings this action against Defendant
Langrock Sperry & Wool, LLP ("Defendant") alleging breach of fiduciary duty (Count
I), breach of contract (Count II), negligent misrepresentation (Count III), and promissory
estoppel (Count IV) arising out an agreement titled "Escrow Agreement."

Pending before the court is Defendant's motion for summary judgment filed on
June 17, 2020. (Doc. 83.) On July 17, 2020, Plaintiff opposed the motion. Defendant filed
a reply on August 7, 2020, at which time the court took the matter under advisement.

Plaintiff is represented by Gregory A. Weimer, Esq. and Lee H. Bals, Esq.
Defendant is represented by Christopher D. Ekman, Esq. and James M. Cooley, Esq.

I.        **The Undisputed Facts.**

A.        **The Parties.**

Plaintiff is a logger and land developer who resides in Medway, Maine. He does
business as McLaughlin Logging and owns McLaughlin Timber Trucking, Ward Cedar
Log Homes, and Northeastern Log Homes.

Landel Land Clearing, LLC ("Landel") is a land clearing company based in
Vermont. Mark Delancey ("Mr. Delancey") was its owner and managing member during

the relevant time period. In the early summer of 2013, Landel had the opportunity to provide work on one or more natural gas pipeline projects owned by Access Midstream Partners (the "Access projects") at worksites in Pennsylvania.

Defendant is a Vermont law firm with offices in Middlebury and Burlington. At all relevant times, Defendant employed James Swift, Esq. ("Attorney Swift") who was retained by Mr. Delancey to negotiate a loan agreement, promissory note, and escrow agreement for Plaintiff's financing of a portion of Landel's work on the Access projects.

### B.    Contractual Negotiations.

In June and July 2013, Plaintiff and Landel negotiated a loan whereby Plaintiff provided Landel a loan to fund a portion of Landel's work on the Access projects in exchange for direct payment of the proceeds from the "first Purchase Order." (Doc. 83-13 at 29.) Landel hired Attorney Swift to assist with drafting documents related to this arrangement. Plaintiff hired Attorney Sean Joyce, Esq. ("Attorney Joyce"), a Maine attorney, to represent his interests.

In the course of the parties' negotiations, Attorney Joyce expressed concerns regarding security for Plaintiff's loan to Landel and originally counseled Plaintiff against providing the requested loan given the financial risk and lack of security in the event of Landel's default. Plaintiff nevertheless decided that he wanted to loan Landel money because he hoped to make a significant profit.

On July 3, 2013, Attorney Swift drafted a Promissory Note, a Lending Agreement, and an Escrow Agreement, which Mr. Delancey signed, as well as an Access Vendor Contract Information form and sent them to Plaintiff and Attorney Joyce for their review. On July 5, 2013, Attorney Joyce replied by email "stating his objections to the documents as drafted." (Doc. 83-1 at 3.)[1]

On July 8, 2013, Landel and/or its agent completed the Vendor Contact Information form identifying Defendant as the payee for Landel's invoices. On that same date, the Vendor Contact Information form was attached to Landel's profile in the Access

---

[1] The parties' filings do not specify these objections.

Midstream Partners' computer database. Also on that same date, Attorney Swift sent a revised version of the Lending Agreement and Promissory Note to Attorney Joyce for his review. On July 9, 2013, Attorney Joyce proposed changes to the Lending Agreement and Promissory Note. Attorney Swift made changes to the documents based on Attorney Joyce's comments, and sent copies of the revised Lending Agreement, Promissory Note, and Escrow Agreement, signed by Mr. Delancey, to Attorney Joyce. The Lending Agreement was changed at Attorney Joyce's request to include a factoring provision that states as follows:

> Lender's written consent must be obtained before Borrower enters into any "factoring" or other financing. In the event Borrower enters into any "factoring" or other financing agreement, Borrower shall be obligated to pay Lender an additional fee of Ten Percent (10%) of all amounts financed through "factoring" or other financing agreements[.]

(Doc. 83-13 at 27-28.)

Plaintiff contends that he entered into a contract with Defendant through the Escrow Agreement and that he signed the Escrow Agreement[2] and Lending Agreement. The Escrow Agreement provides as follows:

### ESCROW AGREEMENT

THIS AGREEMENT, entered into and effective on this 3rd day of July, 2013, by and between Landel Land Clearing, LLC, of Weybridge, Vermont, hereinafter referred to as the "Borrower," and Jay McLaughlin, of Medway, Maine, hereinafter referred to as the "Lender," and Langrock Sperry & Wool LLP, whose office is located in Middlebury, Vermont, hereinafter referred to as the "Escrow Agent;"

### WITNESSETH:

WHEREAS, Borrower and Lender have entered into a Lending Agreement and Promissory Note providing for a loan of $400,000.00 and other terms and conditions;

WHEREAS, the repayment to Lender of all sums due under the Lending Agreement and Promissory Note are to be paid upon receipt by

---

[2] At his deposition, Attorney Swift testified that he believed the Escrow Agreement was not legally effective because he believed Plaintiff never signed it. It is now undisputed that Plaintiff signed the Escrow Agreement.

Borrower of payment of its first Purchase Order on the Access Midstream Pipeline Project;

WHEREAS, the parties agree that the proceeds of the payment of the first Purchase Order are to be held in an escrow account by the Escrow Agent and Escrow Agent is to make payments to Lender of all sums owed under the Lending Agreement and Promissory Note, before payment to Borrower.

NOW THEREFORE, in consideration of the above and for other good and valuable consideration, the parties hereto agree as follows:

1. Borrower shall direct payment of the first Purchase Order on the Access Midstream Pipeline Project to the Escrow Agent to be held and distributed according to the terms of this Agreement, the Lending Agreement and the Promissory Note.

2. Escrow Agent shall pay to Lender the amount owed on the Promissory Note. Escrow Agent shall also pay Lender all other amounts owed Lender which have been agreed to by the parties.

3. The escrow money shall be held in a separate interest bearing bank account established by the Escrow Agent. Any interest in said account shall accrue to the Borrower.

4. In the event of a dispute over payment from the escrow account, the parties agree that the Arbitration clause in the Lending Agreement shall apply to any such dispute.

5. The Escrow Agent shall not be liable to any party except for bad faith or gross neglect. In the event a claim other than bad faith or neglect is asserted against the Escrow Agent, the other parties shall jointly and severally indemnify and hold the Escrow Agent harmless from all loss or expense of any nature, including attorneys' fees, arising out or holding and disbursing of the escrow account. In the event of a dispute unresolved by arbitration, Escrow Agent may pay the balance of the escrow account into a Court of competent jurisdiction for the purpose of determining the rights of the parties to the escrow account. All costs and expenses of such action, including attorney's fees incurred by Escrow Agent, shall be borne jointly and severally by the other parties irrespective of the amount of the escrow account or its remaining balance.

*Id.* at 29-30 (emphasis omitted).[3]

---

[3] At this time, neither side has sought to compel arbitration and the court will not do so sua sponte. *See TicketNetwork, Inc. v. Darbouze*, 133 F. Supp. 3d 442, 446 n.5 (D. Conn. 2015) (holding "neither side has sought to compel arbitration and dismiss the breach of contract aspect

## C.    Plaintiff's Loans to Landel and Landel's Factoring Agreements.

Plaintiff contends that he made additional loans to Landel between August 9 and August 20, 2013 and that on July 16, July 18, July 19, and August 21, 2013 he purchased equipment for the Access projects. He further contends that he and his work crew travelled to Pennsylvania on or about July 22, 2013 and provided Landel with labor between the end of July and mid-September 2013. Plaintiff asserts that he entered into a written agreement with Landel regarding the provision of labor, equipment, and funding of expenses and Landel's payment obligations related thereto (the "July 30th Agreement"). Attorney Joyce was not involved in negotiations regarding additional loans, equipment, labor, and expenses and was not aware of the July 30th Agreement until months after that agreement was signed. Attorney Swift was also not involved in the negotiations and was not aware of the July 30th Agreement until sometime in 2014.

The Escrow Agreement was not amended to specifically incorporate the July 30th Agreement. Plaintiff acknowledges that neither he nor Landel specifically requested that Attorney Swift act as an escrow agent for sums related to equipment, labor, or additional loans or in conjunction with the July 30th Agreement.

On August 20, 2013, Attorney Joyce sent an email to Attorney Swift advising him of Plaintiff's intent to decline the opportunity to provide further funding to Landel. The subject of the email stated it "provided a Notice of Intent to Decline the opportunity to fund payroll obligations of Landel and/or Dell Enterprises." *Id.* This was the first time Attorney Swift received information about the Access projects since July 9, 2013.

On or before September 18, 2013, Landel began securing funding for its expenses on the Access projects from Capstone Business Funding, LLC ("Capstone"), an account receivable factor and purchase order financier who provided consideration for the purchase of accounts receivable in the form of a cash advance, by factoring invoices on

---

of the case. Accordingly, the Court will not do so *sua sponte*."); *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 2015 WL 1442487, at \*3 n.2 (S.D.N.Y. Mar. 27, 2015) (same); *see also CPL, Inc. v. Fragchem Corp.*, 512 F.3d 389, 392 (7th Cir. 2008) (holding "'[d]ismissal on the court's own initiative is particularly ill-conceived as an effort to enforce a contractual arbitration clause' because, like many other contractual rights, it may be waived.") (alteration is original).

the Access projects (the "Capstone factoring agreements"). Attorney Swift was not involved with Landel's efforts to secure factor funding on the Access projects. At Landel's and Capstone's request, Access listed Capstone as the payee on Landel's invoices in Access's accounts payable system.

On September 18, 2013, Capstone filed a UCC Financing Statement with the Vermont Secretary of State listing Landel Land Clearing, LLC as the debtor. Under the Capstone factoring agreements:

> Capstone "purchased" an account receivable from Landel in exchange for advancing 70% of the invoice value to Landel and agreeing to pay a portion of the remaining 30% (depending on the timeliness of payment of the invoice by Access) to Landel as a "rebate." Upon payment by Access, Capstone paid itself a fee (3% of the invoice if timely paid) and then paid the rest over to Landel.

(Doc. 83 at 4-5) (citation omitted).

Landel generated and Access paid invoices totaling $757,208.73 related to Landel's work on the Access projects. Capstone received a total of $42,996.71 in fees from the Access payments based on its factoring agreements. Landel received $710,733.70 for its work on all of the Access projects after Capstone paid itself fees from the Access payments.

Landel generated invoices totaling $26,100 for its work on the first chronological Purchase Order issued by Access for which Capstone received a total fee of $1,044. Landel's net payment for the first Access Purchase Order was therefore $25,056.

On or about September 6, 2013, Plaintiff learned that Landel did not intend to make a full payment and did not intend to comply with the Escrow Agreement. Plaintiff asserts that he wrote a note regarding a conversation he had with Mr. Delancey in which Mr. Delancey said he would not pay the entire portion of one outstanding invoice because he "needed money for the next project." *Id.* at 13 (internal quotation marks omitted). Despite his understanding that Landel did not intend to make a full payment or comply with the Escrow Agreement, Plaintiff acknowledges he told Attorney Joyce to "hold off on" initiating legal action against Landel. *Id.* at 14 (internal quotation marks omitted).

6

Attorney Joyce took no steps to secure Access's agreement to the payment
arrangement set forth in the Escrow Agreement and did not contact Access during the
pendency of Landel's invoices to check on the status of payment of those invoices.

Access paid amounts due to Landel to Capstone and did not pay any amounts to
Defendant as an escrow agent. Attorney Swift ultimately terminated his relationship with
Landel for non-payment of his invoices.

## D.  Plaintiff and Defendant's Interactions Post-Execution of the Escrow Agreement.

Landel repeatedly assured Attorney Swift and Plaintiff that Landel had not been
paid by Access and that payment was forthcoming. Attorney Swift was aware in
September 2013 that Landel had factored the Access payments to Capstone. On
September 24, 2013, Attorney Joyce sent an email to Attorney Swift in which he wrote:

> We would like to schedule a call with the principals and counsel to discuss
> the status of various projects, how [Mr. Delancey] intends to compensate
> [Plaintiff] for use of this machinery, whether [Mr. Delancey] intends to
> comply with the written agreement currently in place between the parties,
> and the timing for monies to be dispersed to [Plaintiff].

*Id.* at 17 (internal quotation marks omitted). Attorney Swift responded on September 25,
2013 and wrote: "Sean, I forwarded this to [Mr. Delancey] and will talk with him." *Id.*
(internal quotation marks omitted). On November 19, 2013, Attorney Joyce emailed
Attorney Swift the following:

> I have phoned you a few times over the past two weeks to discuss the status
> of payment to my client, [Plaintiff], on this contract with Landel and [Mr.
> Delancey].
>
> In July, the following monies were transferred to [Mr. Delancey] under the
> Landel financing arrangements.
>
> | 7/8/13 | 37,000.00 |
> | 7/10/13 | 63,000.00 |
> | 7/16/13 | 100,000.00 |
> | 7/18/13 | 143,000.00 |
>
> In addition, there were additional outlays of monies to [Mr. Delancey], plus
> labor, equipment, and related expenses incurred by my client to work at
> sites in PA. We are preparing a reconciliation on those costs, and will
> provide them shortly.

**Where do we stand on [Mr. Delancey] getting funds from Phase 1 of
the pipeline project?**

*Id.* (emphasis in original). Attorney Swift responded the same day in an email: "Sean: I
just emailed [Mr. Delancey] and asked him to put together a spreadsheet on the monies
due for Phase 1. I will follow up with him with a phone call." *Id.* at 18 (internal quotation
marks omitted).

On December 5, 2013, Attorney Swift sent an email to Attorney Joyce in which he
wrote:

> I talked to [Mr. Delancey] today and he said Access is running behind in
> running the checks. Attached is an email he got from them. He is obviously
> pushing for payment. [Mr. Delancey] and [Plaintiff] have met a couple of
> times and [Mr. Delancey] hopes to have the spreadsheet of what is owed
> complete in the next couple of days so he and [Plaintiff] can hash out what
> is owed and more importantly a payment schedule.

*Id.* (internal quotation marks omitted). On December 23, 2017, Attorney Joyce sent an
email to Attorney Swift in which he stated:

> Your client's delay in providing us with accounting for the monies he's
> spent on Phase 1 and the use of labor and equipment on other projects
> provided by McLaughlin Logging is suggesting to our side that this matter
> may need to go to mediation promptly.
>
> My client intends to take all legal steps necessary to ensure recovery of his
> funding and his labor and equipment expenses, including placing liens on
> property where work was performed in PA.
>
> **Unless a full and satisfactory accounting is received by December 31,
> 2013, and all monies due and owing from receivables are made
> available**, we will trigger the mandatory mediation clause in the governing
> contract.
>
> We have been patient with your client, but our patience is near its endpoint.

*Id.* at 18-19 (emphasis in original). On December 31, 2013, Attorney Swift emailed

Attorney Joyce stating:

> Here is the latest update that I have concerning the delay in payment of the
> Landel invoices. This has been very frustrating for [Mr. Delancey] and I
> believe he has suspended doing further contracts until Access gets Landel's
> invoices paid. [Mr. Delancey] is pushing as hard as possible to get paid so

8

> he can honor his commitments. I will ask [Mr. Delancey] for an update and
> get back to you on Thursday or Friday.

(Doc. 84-1 at 19) (internal quotation marks omitted). On January 3, 2014, Attorney Swift emailed Attorney Joyce: "I am not in my office today but wanted to let you know that [Mr. Delancey] sent me a list of the monies from [Plaintiff]. I need to go over it with him early next week and then forward it to you. Access has still not paid." *Id.* (internal quotation marks omitted).

During his deposition, Attorney Swift testified that "the file that pertains to this particular matter is missing[,]" and that emails from 2013 regarding the Landel representations cannot be recovered. (Doc. 89 at 3) (internal quotation marks omitted). Defendant subsequently stated that it "conducted a diligent search of its hard files and electronic files and identified and produced documents related to Attorney Swift's representation of Landel in its dealings with [Plaintiff], including electronic copies of emails and invoices to Landel." *Id.* Defendant further represents that it secured documents from Landel and produced them in response to Plaintiff's discovery requests, including correspondence between Attorney Swift and Mr. Delancey from June 2013 which was included in Defendant's supplemental response to Plaintiff's original request for production of documents.

Attorney Joyce testified that if he learned of Landel's factoring in September of 2013, there were steps he could have taken to protect Plaintiff's interests: obtaining documents related to the Capstone factoring agreements in order to understand the payment relationship between Landel and Capstone; trying to speak with Access as well as Attorney Swift and Mr. Delancey; and "get[ting] the lay of the land and then figure out who [he was] going to sue." (Doc. 89 at 4) (internal quotation marks omitted).

On May 18, 2018, Plaintiff filed a lawsuit against Attorney Joyce alleging, in part, that he was negligent in failing to ensure amounts owed to Landel were paid into the escrow account and in failing to secure Plaintiff's interests in the stream of payments contemplated under the Escrow Agreement. Plaintiff and Attorney Joyce entered into a settlement regarding Plaintiff's claims.

9

**II.     The Disputed Facts.**

After Attorney Joyce expressed his concerns about security for the loan, Plaintiff contends that in a conversation on July 3, 2013 between Attorney Swift, Attorney Joyce, Plaintiff, and Mr. Delancey, that either Attorney Swift or Mr. Delancey raised the possibility of "having an agreement where monies flowed through" Defendant, (Doc. 84-1 at 3) which Defendant represented "would provide security for repayment of the monies loaned[.]" (Doc. 84 at 15.) Attorney Joyce testified in deposition that during the alleged phone call, "in response to some of the concerns [he] had on security, Attorney Swift or [Mr. Delancey] . . . indicated we'd be willing to do an escrow agreement using Attorney Swift's firm to handle the -- the monies." (Doc. 84-6 at 3.) Attorney Swift similarly testified in deposition that he intended for "the escrow agreement serve as some form of security[.]" (Doc. 84-5 at 11.)

Defendant concedes that although Attorney Swift raised the possibility of an escrow agreement serving as a source of security, he never discussed the possibility of money passing through Defendant. Defendant further contends that Plaintiff has not established that the discussion in question took place during a phone call on July 3, 2013 rather than during a July 2, 2013 call in which they discussed the Escrow Agreement.

Plaintiff asserts that he advanced $400,000.00 to Landel pursuant to the Lending Agreement and Promissory Note between July 8 and July 31, 2013 and that "[a]t some point in time, [A]ttorney Swift became aware that [Plaintiff] put more than $400,000[.00] into Mark Delancey's account." (Doc. 84-1 at 6, ¶ 17.) Defendant, in contrast, claims that while Attorney Swift was aware at some point that more than $400,000 had been placed in Mr. Delancey's account, he was unaware of the amount and timing of Plaintiff's loans to Landel.

Defendant asserts that the Escrow Agreement does not include sums related to equipment, labor, or additional loans subject to the July 30th Agreement and was never amended to reflect those transactions. Plaintiff agrees that the Escrow Agreement was never amended but contends that it nevertheless includes sums due pursuant to the July 30th Agreement as well as other agreements between him and Landel because it states

10

"Escrow Agent shall pay to Lender the amount owed on the Promissory Note. Escrow Agent shall also pay Lender **all other amounts owed Lender which have been agreed to the parties**." (Doc. 83-13 at 29) (emphasis supplied).

Defendant contends that Attorney Swift was unaware that Landel had factored invoices for the first Purchase Order from which Plaintiff was to be paid. Plaintiff disputes this assertion and highlights a September 19, 2013 billing entry that refers to Capstone's UCC filing in which Attorney Swift wrote "Telephone conference to [Mr.] Delancey re factor's UCC filing; email re UCC liens." (Doc. 84-1 at 10) (internal quotation marks omitted). Defendant denies this is a reference to the Capstone factoring agreements and cites Attorney Swift's deposition wherein he testified that he assumes he made the billing entry in question because "[Mr. Delancey] had a question about UCC financing statements." (Doc. 89-3 at 4.)

The chronological first Purchase Order was in the amount of $26,100. Plaintiff asserts this is not the first Purchase Order referenced in the Escrow Agreement, which he claims referred to work that he performed on the Sayre Hill portion of the project. Defendant disputes Plaintiff's interpretation of the "first Purchase Order" as set forth in the Escrow Agreement.

Defendant asserts that Landel represented to Attorney Swift that it had not been paid by Access and payment was forthcoming and argues that Plaintiff was aware that Landel would not pay him in September 2013. In support, Defendant points to a notation in Plaintiff's journal dated September 6, 2019, in which he wrote "[kn]ocked on [Mr. Delancey's] door . . . [t]alked for [two hours] . . . . [Mr. Delancey] said he was not [p]aying all of the [b]ill because be needed money for next project[.] This is [opposite] of contract[.]" (Doc. 83-13 at 45.) Defendant asserts this notation establishes that Plaintiff learned in September 2013 that Landel would not pay him the full amount due under the Lending Agreement and Promissory Note and that Landel did not intend to comply with the Escrow Agreement.

Plaintiff counters that the notes and conversation related to Landel's intent not to pay the entirety of one outstanding bill, rather than the balance of the loan, and that he

11

remained unaware of Landel's intent not to pay any of the amounts due and also remained unaware of the Capstone factoring agreements.

## III. Conclusions of Law & Analysis.

### A. Standard of Review.

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law" are material to the court's determination. *Id.*

At the summary judgment stage, the nonmoving party is entitled to "the benefit of all permissible inferences and all credibility assessments[.]" *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, its opponent must show that there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict" in its favor. *Anderson*, 477 U.S. at 249.

In opposing summary judgment, a party may not "rest upon the mere allegations or denials of the adverse party's pleading," *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (internal quotation marks omitted), nor "simply . . . assert[] a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact" but to "determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of

12

legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

In this case, although certain material facts are disputed, they do not preclude summary judgment if the party that has the burden of proof at trial has not proffered admissible evidence in support of each essential element of its claims. *See Catrett*, 477 U.S. at 322 (holding summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case[]"); *see also El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") (internal quotation marks omitted).

## B. Applicable Substantive Law.

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). To determine which state substantive law applies "a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). Because this case was brought in the District of Vermont, Vermont's choice of law jurisprudence applies.

The Escrow Agreement does not contain a choice of law provision. Under Vermont law, "[w]hen contractual parties have not specified clearly the state law to be applied to a given case," a court should apply the "test laid out in Restatement (Second) Conflict of Laws § 188 to determine which state has the most significant relationship to the transaction and the parties." *Evergreen Bank, N.A. v. Sullivan*, 980 F. Supp. 747, 750 (D. Vt. 1997). These factors include: "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.'" *Pioneer Credit Corp. v. Carden*, 245 A.2d 891, 894 (Vt. 1968) (quoting Restatement (First) Conflict of Laws § 188).

Although the Escrow Agreement was executed in several states and involves parties and entities domiciled, incorporated, or doing business in several states, other factors point to Vermont as the jurisdiction with the most significant relationship to the transaction and the parties. Attorney Swift was the primary drafter of the Escrow Agreement and was employed by Defendant in Vermont. The Escrow Agreement and associated agreements were negotiated at least in part in Vermont. Performance of Defendant's obligations and some of Plaintiff's obligations were contemplated to take place in Vermont. Plaintiff claims the breach of the Escrow Agreement took place in Vermont. Against this backdrop, there is no other jurisdiction with a more substantial connection to the Escrow Agreement than Vermont. As a result, Vermont law governs its interpretation.

## C.   Whether Defendant is Entitled to Summary Judgment Because No Escrow Was Created, Because Defendant Had No Duty to Ensure that Funds Were Delivered, and Because the Escrow Agreement Does Not Contain the Duties on which Plaintiff Bases His Claims.

Attorney Swift responded to Attorney Joyce's concerns regarding security for Plaintiff's loan to Landel by introducing the concept of an escrow agreement. He then assumed a leading role in drafting not only the Escrow Agreement, but a Lending Agreement which prohibited his client, Landel, from entering into a factoring agreement without Plaintiff's written consent. Thereafter, neither Defendant nor Landel performed under the Escrow Agreement and Landel entered into the Capstone factoring agreements which diverted payments from Plaintiff. At some point, Attorney Swift became aware that Landel had placed monies owed to Plaintiff into Mr. Delancey's account. These facts are undisputed.

The parties chose to title their agreement "Escrow Agreement" and to identify Defendant as the "Escrow Agent" who would receive funds from Landel and disburse funds to Plaintiff from an "escrow account." Interpreted in accordance with their plain and ordinary meaning, these terms reflect the parties' intent to enter into an escrow agreement with Defendant serving as an escrow agent. *See Suchoski v. Redhsaw*, 660 A.2d 290, 292 (Vt. 1995) ("We interpret the contract according to its terms and the

14

parties' intent as expressed in the contract language."). Because Attorney Swift is both a Vermont attorney and the drafter of the Escrow Agreement, he may be charged with knowledge that, as an escrow agent, Defendant would have fiduciary duties to Plaintiff under Vermont law. *See Powell v. H.E.F. P'ship*, 793 F. Supp. 91, 93 (D. Vt. 1992) (ruling that defendant "owed a fiduciary duty to plaintiffs because[] . . . it acted as plaintiffs' agent by holding the purchase money in an escrow account pending closing. . . . Regardless of the agreement's express terms, . . . an escrow agent's duty to its principal includes the obligation to disclose information about a known fraud being committed on the principal."). Because the parties agree that an escrow agreement was not created, the court is left with their competing interpretations as to what, if anything, of their agreement remains.

"Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *New England P'ship, Inc. v. Rutland City Sch. Dist.*, 786 A.2d 408, 414 (Vt. 2001) (internal quotation marks omitted). Plaintiff contends that the Escrow Agreement is an enforceable contract that is ambiguous regarding: (1) whether Defendant was obligated to pay Plaintiff even if no money was paid into the escrow account; (2) whether Plaintiff and Landel's July 30th Agreement and other agreements are included in the Escrow Agreement; and (3) whether the term "first Purchase Order" refers to the chronological first purchase order or refers to Plaintiff's work on the Sayre Hill portion of the project.

Plaintiff further points out that he performed his obligations under the Escrow Agreement and had a reasonable expectation that Landel and Defendant would perform theirs as well. Had they done so, he asserts he would have received payment in full on the Promissory Note as well as payments on the July 30th Agreement and other agreements. Because the Escrow Agreement contemplated that Defendant would serve in a fiduciary capacity, he contends it is consistent with the parties' expectations that Defendant be held to a fiduciary duty to disclose anything that would impair Plaintiff's interests.

15

Defendant counters that the Escrow Agreement contains none of the obligations Plaintiff relies on, that "silence is not ambiguity[,]" and "[t]he fact that the Escrow Agreement could have involved additional unspecified terms does not make the existing terms ambiguous." (Doc. 88 at 9.) While Defendant takes pains to disclaim the Escrow Agreement's status as an escrow agreement, it gives short shrift to what remains. If Defendant had no duties to Plaintiff unless Landel paid money into escrow, the Escrow Agreement arguably served no purpose. It certainly offered Plaintiff no greater security than the unsecured Promissory Note. *See Southwick v. City of Rutland*, 2011 VT 53, ¶ 4, 190 Vt. 106, 109, 35 A.3d 113, 115 ("We assume that parties included contract provisions for a reason, and we will not embrace a construction of a contract that would render a provision meaningless.") (internal quotation marks omitted). The Escrow Agreement, itself, does not excuse Defendant's performance if Landel failed to place money in the escrow account. Instead, it is silent on that issue. *See id.* at ¶¶ 7-8, 190 Vt. at 110-11, 35 A.3d at 116 (ruling that a party "cannot escape the plain language of its agreement" and if the court "were to read the contract as [the party] urges," it would render a "detailed clause in the contract . . . a nullity."). On the other hand, Defendant could not be expected to act as an Escrow Agent if no funds were placed in the escrow account.

"The question of whether a contract term is ambiguous is a matter of law for the court to decide." *Isbrandtsen v. N. Branch Corp.*, 556 A.2d 81, 83 (Vt. 1988). "Ambiguity exists where the disputed language will allow more than one reasonable interpretation." *Mueller v. Mueller*, 2012 VT 59, ¶ 22, 192 Vt. 85, 94, 54 A.3d 168, 174 (quoting *O'Connell-Starkey v. Starkey*, 2007 VT 128, ¶ 8, 183 Vt. 10, 14, 944 A.2d 897, 901) (internal quotation marks omitted). If the contract language is ambiguous, "its interpretation is a question of fact to be determined on all the evidence, including extrinsic evidence, to determine the intent of the contracting parties." *Mueller*, 2012 VT 59, at ¶ 20, 192 Vt. at 93, 54 A.3d at 174.

> In determining what one party intended and the other ought to have understood, regard must be had to the situation and purpose of the parties,

the subject matter and course of negotiations.

> The question whether there was a contract between the parties does not depend alone upon the specified facts found but also upon the reasonable inferences to be drawn from them.

*Bixler v. Bullard*, 769 A.2d 690, 694 (Vt. 2001) (internal quotation marks omitted).

"The specific facts as well as any inferences to be drawn from the circumstances surrounding each individual case may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." *Id.* (quoting *Winston v. Mediafare Ent. Corp.*, 777 F2d 78, 81 (2d Cir. 1985) (quoting Restatement (Second) of Contracts § 27 cmt. c (1981)).

Even if the parties agree that the intended purpose of the Escrow Agreement was not served, they differ markedly as to what should happen as a result. The Escrow Agreement provides scant guidance as to the intended outcome.

For example, pursuant to the Escrow Agreement, "proceeds of the payment of the first Purchase Order are to be held in an escrow account by the Escrow Agent and Escrow Agent is to make payments to Lender of all sums owed under the Lending Agreement and Promissory Note, before payment to Borrower." (Doc. 83-12 at 5.) The Escrow Agreement, however, does not specify any recourse or consequences if payments are not made.

In a separate provision, the Escrow Agreement states that the "Escrow Agent shall pay to Lender the amount owed on the Promissory Note. Escrow Agent shall also pay Lender all other amounts owed Lender which have been agreed to by the parties." *Id.* This obligation is not conditioned upon the Escrow Agent's receipt of funds. According to its plain language, Defendant, as the Escrow Agent, appears to have an independent obligation to pay not only the Promissory Note but "all other amounts" Landel owed to Plaintiff. Plaintiff urges the court to adopt this interpretation, contending it is consistent with Attorney Swift's representation that the Escrow Agreement would serve as security in the event of Landel's default. Defendant responds that the parties' agreements do not reflect any intention to render Defendant a guarantor of its client's debts and points out

17

that this interpretation would produce an absurd result. *See State v. Philip Morris USA Inc.*, 2008 VT 11, ¶ 18, 183 Vt. 176, 185, 945 A.2d 887, 894 (recognizing that "[n]onsensical interpretations of contracts . . . are disfavored . . . [n]ot because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts . . . that they believe will have absurd consequences.") (quoting *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002)) (internal quotation marks omitted) (omissions and second alteration in original).

The Escrow Agreement further states that "repayment to Lender of all sums due under the Lending Agreement and Promissory Note are to be paid upon receipt by Borrower of payment of its first Purchase Order on the Access Midstream Pipeline Project[.]" (Doc. 83-12 at 5.) Plaintiff claims that the term "first Purchase Order" does not mean the chronological first purchase order but instead means the purchase order for Plaintiff's work on the Sayre Hill portion of the project. The Escrow Agreement does not support this interpretation, but it is not wholly nonsensical because the chronological first Purchase Order was only in the amount of $26,100 and thus would not be sufficient to repay "all sums due under the Lending Agreement and Promissory Note" as required by the Escrow Agreement. *Id.*

The Escrow Agreement includes not only the "first Purchase Order" but also "all other amounts owed Lender which have been agreed to by the parties." *Id.* Plaintiff contends this includes the July 30th Agreement and the agreements for the provision of money, labor, or equipment he entered into with Landel. Defendant asserts that only payment of the "first Purchase Order" was required to be placed in the escrow account and Attorney Swift had no knowledge of any other agreements. The phrase "agreed to by the parties" may require Attorney Swift's assent to any additional agreements or it may require only Plaintiff's and Landel's consent.

The Escrow Agreement purports to excuse Attorney Swift from all liability except in the case of "bad faith or gross neglect." *Id.* It does not limit Attorney Swift's liability for "bad faith or gross neglect" to the holding and disbursing of funds and thus arguably includes liability "bad faith or gross neglect" in the event of non-performance. The terms

18

"bad faith and gross neglect" are not defined by the Escrow Agreement, nor is there any explanation of the acts or omissions the parties had in mind.

Although the Escrow Agreement states that the parties have a duty to indemnify Attorney Swift for a "claim other than bad faith or neglect"[4] this provision further requires a "loss or expense of any nature . . . arising out [of] holding and disbursing of the escrow account." *Id.* at 5-6. There is apparently no duty to indemnify if the "loss or expense" is not incurred in the context of "holding and disbursing" funds.

Both Plaintiff and Landel were represented by counsel in negotiating and executing the Escrow Agreement. In drafting the Escrow Agreement, Attorney Swift made Defendant a party thereto and cast Defendant in a role that, under Vermont law, carries with it both contractual and fiduciary duties. The Escrow Agreement is not only ambiguous with regard to its intended purpose in the event no escrow is created, but contains several ambiguous material terms. Because of these ambiguities, the court cannot interpret it as matter of law. *See City of Newport v. Vill. of Derby Ctr.*, 2014 VT 108, ¶ 6, 197 Vt. 560, 565, 109 A.3d 412, 416 (holding that "[i]f the court determines a contract term to be ambiguous, . . . then the trier of fact determines the meaning intended by the parties.").

For the reasons stated above, Defendant's motion for summary judgment because no escrow was created, because Defendant had no duty to ensure funds were delivered, and because Plaintiff relies on duties not contained in the Escrow Agreement is DENIED.

### D.    Whether Summary Judgment Must be Granted Because Plaintiff Failed to Introduce Expert Testimony in Support of His Claims.

Defendant asserts that summary judgment must be granted with regard to each of Plaintiff's claims because he failed to introduce expert testimony regarding the professional duty of care and "a jury is not in a position to understand, without expert testimony, whether the standard of care for someone in Attorney Swift's position

---

[4] It is not clear whether use of the term "neglect" as opposed to "gross neglect" is intentional or is a typographical error. (Doc. 83-12 at 5.)

includes the tasks alleged by Plaintiff." (Doc. 88 at 4.)[5] Plaintiff responds that this case does not involve professional malpractice because Defendant was not Plaintiff's attorney and therefore only common knowledge and experience are necessary to determine whether there was a breach of Defendant's alleged fiduciary and contractual duties.

"Generally, negligence by professionals is demonstrated using expert testimony to: (1) describe the proper standard of skill and care for that profession, (2) show that the defendant's conduct departed from that standard of care, and (3) show that this conduct was the proximate cause of plaintiff's harm." *Est. of Fleming v. Nicholson*, 724 A.2d 1026, 1028 (Vt. 1998). However, "[w]here a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it, expert testimony is not required to assist the trier of fact in finding the elements of negligence." *Id.*

Where a claim is not grounded in professional malpractice but instead arises solely from the parties' contract, expert testimony regarding the standard of care is not required. Once a jury interprets the Escrow Agreement's ambiguous terms, its interpretation will govern Defendant's duties thereunder. *See S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 410 A.2d 1359, 1364 (Vt. 1980) ("In the obligation assumed by a party to a contract is found his duty, and his failure to comply with the duty constitutes a breach. In addition, accompanying every contract is an implied duty to perform with care, skill, reasonable expedience and faithfulness.") (citation and internal

---

[5] Although Defendant cites cases in which expert testimony was required for breach of contract and breach of fiduciary claims, each of those cases involved a professional duty of care that existed even in the absence of a written contract. *See, e.g.*, Doc. 83 at 41 (citing *Schwarzkopf v. Secor*, Dkt. No. 256-9-18 Bncv (Vt. Sup. Ct. Feb. 28, 2020) (observing that expert testimony was necessary to establish whether engineers breached a fiduciary duty owed to plaintiffs whose claims were premised on "the manner in which [the engineers] carried out their work under the contract[,]" which "required [the engineers] to exercise their professional judgment in the manner in which they performed their work and oversaw the project.")); *Lefebvre v. Cawley*, 2010 WL 286731, at *1 (Vt. Jan. 15, 2010) (affirming trial court's refusal to instruct the jury on breach of contract in a legal malpractice case against attorney arising out of client's purchase of real property because the "plaintiff had failed to present evidence demonstrating a standard of care."). In contrast, as opposing counsel, Attorney Swift generally had no duty of care to Plaintiff beyond that, if any, he assumed in the Escrow Agreement.

quotation marks omitted). The jury will further determine whether there has been a breach of those duties. In such circumstances, expert witness testimony is not required because the Escrow Agreement does not relate "to a profession beyond the understanding of the average layman[.]" *Id.* at 1363.

Defendant's motion for summary judgment for failure to introduce expert testimony is therefore DENIED.

### E.   Whether Defendant is Entitled to Summary Judgment on Plaintiff's Breach of Fiduciary Duty Claim.

Plaintiff contends that Defendant was a fiduciary and owed duties to him, including a duty to advise Access of the Escrow Agreement, to ensure Access paid monies owed to Landel into the escrow account, and to advise Plaintiff of the Capstone factoring agreements. Plaintiff further asserts that he relied on Attorney Swift's assurance that the Escrow Agreement would provide security for repayment when he decided to loan funds to Attorney Swift's client. Under Vermont law, in order withstand summary judgment on his breach of fiduciary duty claim, Plaintiff must proffer admissible evidence that: "(1) [Defendant] owed [Plaintiff] a fiduciary duty; and (2) that duty required [Defendant ] to act in good faith and with loyalty for the advancement of [Plaintiff's] interests." *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 10, 188 Vt. 245, 252, 6 A.3d 701, 706.

If the parties intended Defendant to perform as a fiduciary under the Escrow Agreement even if no funds were placed in the escrow account, Plaintiff's claims that Defendant breached its duties of disclosure may have some force. If no escrow agreement was intended unless and until Landel placed money into the escrow account, Plaintiff will have to establish that the relationship between him and Defendant was nonetheless one of trust and confidence. *See McGee v. Vt. Fed. Bank, FSB*, 726 A.2d 42, 44 (Vt. 1999) (holding that "[i]n order for [one party] to have become a fiduciary, the relationship ha[s] to ripen into one in which the [other party] w[as] dependent on, and reposed trust and confidence in, the [initial party] in the conduct of its affairs."). In the latter event, Plaintiff will face an uphill battle because no duty extends from "an attorney to a third-

21

Case 2:19-cv-00112-cr   Document 92   Filed 02/12/21   Page 22 of 31

party who claims to be injured by virtue of the attorney's representation of his or her client in the absence of privity of contract[.]" *Qureshi v. People's United Bank*, 2020 WL 2079922, at \*9 (D. Vt. Apr. 30, 2020); *Hedges v. Durrance*, 2003 VT 63, ¶¶ 6, 9, 175 Vt. 588, 589-90, 834 A.2d 1, 3-4 (recognizing "the longstanding common-law rule[]" that "an attorney owes a duty of care only to the client and not to third parties[]" and noting that "[a] dramatic expansion of the requirements regarding privity and duty of care would have profound consequences."); *see also Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 259 (S.D.N.Y. 2008) ("The plaintiffs have not cited any authority for the proposition that opposing counsel may owe fiduciary duties to an adversary who is independently represented and we decline to so hold."). On the other hand, in this case, Defendant *was* in privity of contract with Plaintiff and arguably acted as Plaintiff's agent as well as Landel's agent pursuant to the Escrow Agreement. Under Vermont law, "[a] fiduciary duty of loyalty is implied in every agency as a matter of law." *In re Est. of Kurrelmeyer*, 2006 VT 19, ¶ 17, 179 Vt. 359, 369, 895 A.2d 207, 215. In turn, under Vermont law, fiduciaries have duties of disclosure.[6]

Although "[t]he existence or nonexistence of a duty is a question of law to be decided by the court[,]" *McGee*, 726 A.2d at 44, this duty cannot be determined where both the terms of the Escrow Agreement are ambiguous and its intended purpose if an escrow is not created are contested. *See Phones Plus, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 2007 WL 3124733, at \*6 (D. Conn. Oct. 23, 2007) (observing that "questions of fiduciary status, responsibilities, and breaches involve questions of fact.").

---

[6] *See Sutfin v. Southworth*, 539 A.2d 986, 988 (Vt. 1987) ("The test of liability for failure to disclose facts material to the transaction is some duty, legal or equitable, arising from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge.") (quoting *Newell Brothers v. Hanson*, 123 A. 208, 210 (Vt. 1924)) (internal quotation marks omitted); *Powell v. H.E.F. P'ship*, 793 F. Supp. 91, 95 (D. Vt. 1992) (holding that "even outside its role as escrow, as a lender and participant in the sales of units[,] [defendant] may have had a duty to disclose to the plaintiffs information that it obtained without substantial investment[.]").

22

Because under Fed. R. Civ. P. 56, a genuine dispute of material facts precludes summary judgment, Defendant's motion for summary judgment on Plaintiff's breach of fiduciary duty claim is DENIED.

## F.   Whether Defendant is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim.

Defendant seeks summary judgment on Plaintiff's breach of contract claim, arguing that it owed no duties to Plaintiff other than those set forth in the Escrow Agreement and that Plaintiff's implied covenant of good faith and fair dealing is duplicative of his breach of contract claim.

> The definition of the covenant of good faith and fair dealing is broad. An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement. The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.

*Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 635 A.2d 1211, 1216 (Vt. 1993) (citation and internal quotation marks omitted). An implied covenant claim may not "interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 18, 177 Vt. 70, 80, 857 A.2d 263, 270 (internal quotation marks omitted); *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 716 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014) ("Vermont law does not permit the implied covenant" to be used to create "contractual obligations that do not otherwise exist.").

The court cannot determine whether Plaintiff's breach of contract claim is based on duties not contained in the Escrow Agreement until the ambiguities therein are resolved. Likewise, the court cannot determine whether Plaintiff's implied covenant of good faith and fair dealing claim seeks to impose duties not agreed to by the parties. In addition, there are disputed issues of material fact as to whether Defendant undermined Plaintiff's right to the benefits of the Escrow Agreement and whether Defendant acted in good faith. *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 50, 179 Vt. 167, 185,

893 A.2d 298, 314 (concluding that "good faith is ordinarily a question of fact, one particularly well-suited for juries to decide") (internal quotation marks omitted).

"A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct." *Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196, 202, 932 A.2d 1045, 1050. In his Complaint, Plaintiff asserts that Defendant failed to advise Access of the Escrow Agreement, failed to ensure Access paid money owed to Landel into the escrow account, and failed to advise Plaintiff that Landel breached the Lending Agreement by entering into the Capstone factoring agreements. To the extent these same allegations form the basis of Plaintiff's breach of the implied covenant claim, they are duplicative and subject to dismissal because "Vermont law does not recognize a separate cause of action for violation of the covenant of good faith and fair dealing when a plaintiff also pleads a breach of contract claim based on the same conduct." *Mount Snow Ltd. v. ALLI, the All. of Action Sports*, 2013 WL 4498816, at *7 (D. Vt. Aug. 21, 2013); *see also Monahan*, 2005 VT 110, at ¶ 54 n.5, 179 Vt. at 187 n.5, 893 A.2d at 316 n.5 (holding "we will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*.") (emphasis in original).

The court therefore GRANTS Defendant's motion for summary judgment to the extent Plaintiff's implied covenant claims are duplicative of his breach of contract claims and DEFERS RULING on whether Plaintiff's breach of contract and implied covenant claims are based on contractual terms not contained in the Escrow Agreement until the ambiguities therein are resolved.

## G. Whether Defendant is Entitled to Summary Judgment on Plaintiff's Negligent Misrepresentation Claim.

Plaintiff's negligent misrepresentation claim is premised on his contention that in the July 2013 phone call, Attorney Swift assured Plaintiff that it would "secure" the money under the Lending Agreement and Promissory Note by "tak[ing] the actions

which were necessary to assure compliance with the [Escrow Agreement]." (Doc. 84 at 15.) He argues that he relied, in part, on that assurance when making the loan to Landel.

Vermont has adopted from the Restatement (Second) of Torts the definition of "negligent misrepresentation":

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Howard v. Usiak*, 775 A.2d 909, 912-13 (Vt. 2001) (quoting *Limoge v. People's Tr. Co.*, 719 A.2d 888, 890 (Vt. 1998)). A plaintiff asserting a negligent misrepresentation claim must also show "justifiable reliance" which "is determined under an objective standard; . . . when the representation is not obviously false and the truth of the representation is not within the knowledge of, or known by the plaintiffs." *Limoge*, 719 A.2d at 890 (quoting Restatement (Second) of Torts § 552(1)) (internal quotation marks omitted).

The Vermont Supreme Court has "emphasized in prior cases the need to keep tort and contract theories separate so that negligence concepts do not overrun the limitations on contractual rights and remedies[]" and has therefore held that "information for purposes of the elements of negligent misrepresentation does not normally include the intention to perform a contractual commitment." *Howard*, 775 A.2d at 913-14 (internal quotation marks omitted). In other words, a plaintiff cannot "turn[] a promise to perform into a statement of fact so that failure to perform automatically shows a misrepresentation of intention to perform." *Id.* at 913.

Attorney Swift's alleged negligent misrepresentation was that he would provide "security" for Plaintiff's loan to Landel through an escrow agreement.[7] Thereafter, Plaintiff and Landel, both represented by counsel, negotiated an Escrow Agreement that

---

[7] Plaintiff offers Attorney Swift's deposition testimony that he responded "yes" to the question "what you were proposing is that the [E]scrow [A]greement serve as some form of security?" (Doc. 84-5 at 11.)

arguably does not offer that security. "Though misrepresentations of present or past fact have the potential to create liability for the speaker, mere unfulfilled promissory statements as to what will be done in the future are not actionable as such." *Matsumura*, 542 F. Supp. 2d at 253 (brackets and internal quotation marks omitted).

Attorney Swift did not misrepresent a past or present fact. He provided his interpretation of an agreement that had not yet been drafted. Even if Plaintiff could cast that as a negligent misrepresentation, he cannot satisfy the requirement of objectively reasonable reliance.

In evaluating whether a party's reliance is reasonable, the entire context of the transaction is considered "including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (noting under New York law that where a party "proceeds with a transaction without . . . *inserting appropriate language in the agreement for his protection*, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.") (citation omitted) (emphasis in original); *see also Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 174 (D.D.C. 2011) (finding there can be no reasonable reliance when the claimed reliance is "flatly contradicted by the express terms of the [agreement]").

"Skepticism . . . is obviously compounded when the plaintiff alleges reliance on opposing counsel's opinion or advice, and not a representation of fact." *Matsumura*, 542 F. Supp. 2d at 257. "Courts have routinely held that it is unreasonable for a party 'to rely on the advice of adversary counsel . . . when both parties are aware that adverse interests are being pursued.'" *Id.* (quoting *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993)) (omission in original).

Plaintiff's professional malpractice lawsuit against Attorney Joyce supports a conclusion that he relied on his own attorney's advice in entering into the Escrow Agreement. He professes no belief that Attorney Swift was representing his interests. To the contrary, he knew that Attorney Swift was representing Landel and that his interests and those of Landel were adverse. He does not dispute that his own attorney cautioned

him against loaning money to Landel without adequate security in the event of default. Plaintiff nonetheless decided to proceed with the loan because he hoped to make a significant profit. Thereafter, Plaintiff's attorney negotiated an Escrow Agreement which Plaintiff signed. Based on these undisputed facts, no rational fact finder could find it was objectively reasonable for Plaintiff to rely on Attorney Swift's verbal interpretation of a yet-to-be drafted written agreement when deciding whether to make a $400,000 loan. *See Coon v. Wood*, 68 F. Supp. 3d 77, 84 (D.D.C. 2014) ("While reasonable reliance can be a jury issue, dismissal for failure to state a claim is proper when no reasonable person would have relied on the representation.") (internal quotation marks omitted).

Because Plaintiff's negligent misrepresentation claim is duplicative of his breach of contract claim and because his reliance was not objectively reasonable, Defendant's motion for summary judgment on that claim is GRANTED.

## H. Whether Defendant is Entitled to Summary Judgment on Plaintiff's Promissory Estoppel Claim.

Plaintiff seeks equitable relief based on Defendant's alleged promise to "receive monies due Landel directly from Access[,]" "take steps to assure Access monies would go into a Langrock Sperry account[,]" and "pay monies owed to Plaintiff . . . by Landel from the monies in the Langrock Sperry account[.]" (Doc. 45 at 11, ¶ 59.) Defendant argues that it is entitled to summary judgment on Plaintiff's promissory estoppel claim because there was no "un-bargained for reliance[,]" (Doc. 83 at 17), the parol evidence rule bars this claim, and it is Plaintiff's attempt "to take a second bite at the apple if his breach of contract claim fails[.]" *Id.*

Under Vermont law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 799 (Vt. 2000) (quoting *Foote v. Simmonds Precision Prods. Co.*, 613 A.2d 1277, 1281 (Vt. 1992)) (internal quotation marks omitted). "The doctrine of promissory estoppel evolved to prevent 'injustice and unconscionable advantage' where an exchange of

promises did not create a binding contract." *Big G Corp. v. Henry*, 536 A.2d 559, 562 (Vt. 1987) (quoting *Overlock v. Cent. Vt. Pub. Serv. Corp.*, 237 A.2d 356, 358-59 (Vt. 1967)).

In the event the Escrow Agreement is enforceable, promissory estoppel will not apply because "[c]ase law and common sense dictate that parties to an agreement must embody all terms and conditions in their final writing. Any terms and conditions not included will be null and void." *Big G Corp.*, 536 A.2d at 594 (holding if there is an enforceable written contract "[t]he doctrine of promissory estoppel is not applicable."); *see also LoPresti v. Rutland Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 47, 177 Vt. 316, 337, 865 A.2d 1102, 1119 (holding that the trial court correctly applied the "well-established rule that promissory estoppel will not apply when the relationship of the parties is governed by a contract.").

Conversely, because the parol evidence rule applies only to written agreements, *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 595 A.2d 1341, 1344 (Vt. 1991) ("The parol evidence rule is applicable to exclude evidence of a prior or contemporaneous oral agreement offered to vary or contradict the terms of a written agreement."), it will have no application if the Escrow Agreement is deemed unenforceable.

As Plaintiff points out, Defendant alleges no contract was formed or delivered as an affirmative defense. To the extent Defendant prevails in that defense, Plaintiff may pursue promissory estoppel as an alternative theory of recovery. For this reason, Defendant's motion for summary judgment on Plaintiff's promissory estoppel claim is CONDITIONALLY DENIED.

## I.   Whether Defendant is Entitled to Summary Judgment Because Plaintiff Cannot Prove Causation and Damages.

Defendant asserts that it is entitled to judgment as a matter of law with regard to each of Plaintiff's claims because he cannot establish causation or damages. It contends Plaintiff's damages were not foreseeable; are speculative; were not within the

28

contemplation of the parties when they contracted; and were attributable to an intervening, superseding cause.

Under Vermont law "'[c]onsequences which are contingent, speculative, or merely possible are not entitled to consideration in ascertaining . . . damages.'" *My Sister's Place v. City of Burlington*, 433 A.2d 275, 281 (Vt. 1981) (quoting *Howley v. Kantor*, 163 A. 628, 631 (Vt. 1933)). In order to determine whether Plaintiff's damages were caused in whole or in part by Defendant, the court must first decide what duties and obligations, if any, Defendant owed Plaintiff under the Escrow Agreement. Thereafter, the court may grant Defendant judgment as a matter of law only if no reasonable jury could find Defendant responsible, in whole or in part, for Plaintiff's harm. *See Bernasconi v. City of Barre*, 2019 VT 6, ¶ 12, 209 Vt. 419, 423, 206 A.3d 720, 723 ("While causation is ordinarily a question for the jury, where a reasonable jury could not find that the defendant caused the plaintiff harm, a court must award judgment as a matter of law."). In making this determination, Landel's alleged malfeasance and Attorney Joyce's alleged malpractice would not necessarily defeat Plaintiff's recovery. *See Choiniere v. Sulikowski*, 229 A.2d 305, 308 (Vt. 1967) (observing that "[t]here may be more than one proximate cause concurring to produce an injury.").

Because material facts and the terms of the Escrow Agreement are disputed, Defendant's motion for summary judgment due to lack of causation and other challenges to damages must be DENIED.

### J.    Whether Plaintiff's Damages are Limited to the "first Purchase Order" or whether Plaintiff may Recover Damages for Amounts Due under the July 30th Agreement and Other Agreements.

Defendant argues that Plaintiff cannot recover damages for amounts owed under the July 30th Agreement or any subsequent agreements between Landel and Plaintiff because Defendant's duties were limited by the Escrow Agreement which confines Plaintiff's recovery to the amounts due under the first Purchase Order. Plaintiff points out that the Escrow Agreement states that "Escrow Agent shall also pay Lender all other amounts owed Lender which have been agreed to by the parties." (Doc. 83-13 at 29.)

Because there is a genuine dispute of material fact regarding whether the Escrow Agreement contains an obligation to pay monies due under the July 30th Agreement, as well as amounts due under other agreements between Plaintiff and Landel, Defendant's motion for summary judgment based on Plaintiff's inability to recover damages under the July 30th Agreement and other agreements is DENIED.

### K.    Whether Plaintiff Can Recover Attorney's Fees.

Plaintiff agrees that it is not entitled to an award of attorney's fees and withdraws this claim. Defendant's motion for summary judgment on this issue is therefore DENIED AS MOOT.

### L.    Whether Plaintiff Has Established Malice Sufficient to Award Punitive Damages.

"Not every claim of bad faith, conversion, or breach of fiduciary duty warrants a punitive-damages award." *Beaudoin ex rel. New England Expedition Ltd. P'ship II v. Feldman*, 2018 VT 83, ¶ 19, 208 Vt. 169, 179, 196 A.3d 768, 776. "An award of punitive damages requires a showing of: (1) wrongful conduct that is outrageously reprehensible; and (2) malice." *Smejkal*, 2010 VT 66, at ¶ 34, 188 Vt. at 261, 6 A.3d at 713. Malice, in turn, is defined as "bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Fly Fish Vt., Inc. v. Chapin Hill Ests., Inc.*, 2010 VT 33, ¶ 18, 187 Vt. 541, 549, 996 A.2d 1167, 1173. Because Vermont law "require[s] a showing that defendant[] acted with actual malice before . . . the issue of punitive damages [may] go to a jury[,]" *Follo v. Florindo*, 2009 VT 11, ¶ 44, 185 Vt. 390, 411, 970 A.2d 1230, 1245, if the facts do not satisfy this exacting standard, the court may deny a claim for punitive damages as a matter of law. *Fly Fish Vt., Inc.*, 2010 VT 33, at ¶¶ 26-27, 187 Vt. at 553-55, 996 A.2d at 1176-77.

Although Plaintiff does not assert that Defendant acted for its own benefit or that Attorney Swift harbored personal spite or hatred toward Plaintiff, he contends that Defendant put itself in a position of trust and "was aware that it would not be honoring that position of trust" and "affirmatively misl[ed] Plaintiff as to the true state of affairs." (Doc. 84 at 19.) A reckless or even deliberately false statement by an attorney made to an

adverse party's counsel does not, as a matter of law, rise to the level of "outrageously reprehensible" conduct that has "the character of outrage frequently associated with crime[.]" *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1095 (Vt. 1999) (internal quotation marks omitted); *Fly Fish Vt., Inc.*, 2010 VT 33, at ¶ 28, 187 Vt. at 555, 996 A.2d at 1178 (observing that reckless indifference to another party's rights "invokes no more culpability for punitive damages than the 'knowing and willful' misconduct already determined legally insufficient under our case law."). This same outcome is not warranted if Defendant intentionally misled Plaintiff while acting in a fiduciary capacity regarding Landel's intent to perform under the Escrow Agreement or if Defendant knew of the existence of the Capstone factoring agreements and failed to disclose them. In that event, a jury rather than the court should decide whether punitive damages are warranted.

Defendant's motion for summary judgment with regard to Plaintiff's punitive damages claim is therefore GRANTED insofar as it pertains to Attorney Swift's statements to Attorney Joyce regarding the purpose of the Escrow Agreement and DENIED as to the remainder of Plaintiff's punitive damages claim.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment as to Plaintiff's negligent misrepresentation claim and a portion of Plaintiff's punitive damages claims. The court GRANTS Defendant's motion for summary judgment as to Plaintiff's breach of the implied covenant of good faith and fair dealing claim to the extent it is based on the same conduct as his breach of contract claim. The court DEFERS RULING on whether Plaintiff's breach of contract and implied covenant claims are based on contractual terms not contained in the Escrow Agreement. The court DENIES all other aspects of Defendant's motion for summary judgment. (Doc. 83.) SO ORDERED.

Dated at Burlington, in the District of Vermont, this 12th day of February, 2021.

Christina Reiss, District Judge
United States District Court

31